TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN









NO. 03-04-00109-CV






The Electric Reliability Council of Texas, Inc., Appellant


v.


Met Center Partners-4, Ltd., Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. GN300722, HONORABLE DARLENE BYRNE, JUDGE PRESIDING




M E M O R A N D U M O P I N I O N




 In this appeal, we must decide whether a landlord's notice of receipt of a bona fide
offer trumps a tenant's exercised purchase option based on the terms of a right of first refusal in their
building's lease. Electric Reliability Council of Texas, Inc. ("ERCOT") appeals the district court's
take-nothing judgment declaring after a jury trial that, under the terms of the parties' lease, ERCOT's
previously exercised option to purchase the building terminated when Met Center Partners-4, Ltd.
gave ERCOT notice of a third party's bona fide offer.

 ERCOT challenges the judgment by arguing that (i) Met Center did not receive a bona
fide offer as a matter of law and the jury's finding of a bona fide offer should be disregarded as an
immaterial answer to a legal question, (ii) the evidence was factually insufficient to support the
jury's finding of a bona fide offer, (iii) the lease's right of first refusal did not trump ERCOT's
exercised purchase option, and (iv) Met Center could not invoke the right of first refusal because it
repudiated the purchase option.

 We conclude that (i) ERCOT waived any issue on the bona fide offer question, a
mixed question of law and fact, by failing to object to the submission of the question during the
charge conference, (ii) the evidence was factually sufficient to support the finding of a bona fide
offer, (iii) the language of the parties' lease expressed their intent that the right of first refusal trump
the purchase option, and (iv) the jury's findings of Met Center's repudiation were rendered
immaterial by the court's declaration that the right of first refusal trumped the purchase option. 
Accordingly, we affirm the district court's judgment.



BACKGROUND

The Lease Terms

 ERCOT is a nonprofit corporation responsible for coordinating power transmission
and preventing power outages throughout most of Texas. Met Center Partners-4, Ltd. is a real estate
limited partnership that owns Building Three in a development at the intersection of State Highway
71, Riverside Drive, and State Highway 183 in Austin. Zydeco Development, Inc., is the company
that is Met Center's sole general partner. Effective July 21, 2000, before the construction of
Building Three, ERCOT leased the building from Met Center for a term of 120 months, renewable
for two consecutive five-year periods. The leased premises in the completed shell of the building
consisted of approximately 45,000 square feet. Met Center provided ERCOT a $20 per square foot
finish-out allowance, a total of $900,000. After making ERCOT's requested changes to the shell of
the building, Met Center paid ERCOT $315,274, the balance of the finish-out allowance. In addition
to these building modifications, ERCOT installed specialized equipment inside the premises to
maintain the grid of electric transmission lines that serve most of the state.

 The parties have had a strained relationship since the lease was signed. Met Center
missed the building's targeted completion deadline. Displeased, ERCOT moved into the building
without notifying Met Center. Upon discovering that ERCOT had occupied the building, Met Center
demanded that ERCOT begin paying rent. ERCOT then began sending every rent payment with a
statement that it was made "under protest." ERCOT and Met Center also disagreed about the cost
of ERCOT's requested modifications to the building. The parties' mutual distrust culminated in the
present litigation over the effect of Met Center's notice of its receipt of a bona fide offer on
ERCOT's exercised purchase option.

 "Exhibit D" to ERCOT's lease contained two purchase options and a right of first
refusal for the property. The first purchase option in paragraph 2(a) gave ERCOT the right to
purchase the property for a fixed price and was not subject to termination by the right of first refusal
provisions in paragraph 2(c):


(a) Tenant shall have the right to purchase the Property for a price of $5,850,000.00
payable in cash at the closing by giving Landlord written notice of Tenant's
exercise of its right to purchase the Property at any time prior to the date on
which the Tenant Improvements are substantially completed or the City of
Austin issues a Certificate of Occupancy for the leased premises, whichever
occurs first; provided Tenant is not in default hereunder at the time such right
to purchase is exercised or at the closing of the sale and purchase of the Property
pursuant thereto.



ERCOT did not exercise this pre-occupancy purchase option.

 ERCOT did exercise the market-price purchase option under paragraph 2(b). This
second option was available to ERCOT anytime during the term of the lease and was subject to
termination by the right of first refusal in paragraph 2(c). This lease provision contained a formula
for calculation of the purchase price and a method for selecting appraisers to resolve disputes over
fair market value:


(b) If Tenant fails to exercise its right to purchase the Property as set forth in (a)
above, Tenant shall have a continuing right to purchase the property during the
term of this Lease and provided Tenant is not in default hereunder at the time
such right to purchase is exercised or at the closing of the sale and purchase of
the Property pursuant thereto for a price equal to the Fair Market Value of the
Property reduced by an amount equal to (1) the amount by which the fair market
value of the improvements to the Leased Premises the cost of which have been
paid by Tenant (exclusive of the Tenant Allowance) contributes to the Fair
Market Value of the Property, (2) multiplied by a fraction, the numerator of
which is the number of months remaining in the unexpired initial Term of this
Lease, and the denominator of which is 60 months. (1) Tenant shall exercise its
right to purchase the Property pursuant to the provisions of this paragraph (b) by
giving Landlord written notice of Tenant's exercise of its right to purchase the
Property ("Purchase Option Notice"). The Fair Market Value of the Property
shall be determined as follows:


 (i) Within fifteen (15) days after the date of the Purchase Option Notice,
Landlord shall give Tenant written notice of Landlord's determination of
the Fair Market Value of the Property setting forth in reasonable detail the
assumptions and data upon which such determination is made. If Tenant
disagrees with Landlord's determination of the Fair Market Value of the
Property, Tenant shall give Landlord notice of such disagreement, and of
Tenant's determination of the Fair Market Value of the Property, within
fifteen (15) days after the date of the notice of Landlord's determination of
the Fair Market Value. In the event Tenant fails to so give Landlord notice
of Tenant's disagreement with Landlord's determination of the Fair Market
Value of the Property, Tenant shall be conclusively deemed to have
accepted Landlord's determination of the Fair Market Value of the
Property.


 (ii) If Tenant gives Landlord notice of Tenant's disagreement with Landlord's
determination of the Fair Market Value of the Property as provided in
paragraph (i) above, Landlord and Tenant shall in good faith attempt to
agree on the Fair Market Value of the Property. In the event Landlord and
Tenant fail to agree on the Fair Market Value of the Property within sixty
(60) days after the date of the Renewal Notice, (2) the Fair Market Value of
the Property shall be determined by an appraisal in accordance with
paragraph (d) below.


 (iii) Landlord and Tenant shall attempt in good faith to mutually agree on an
appraiser to make such determination. In the event Landlord and Tenant
fail to agree on such appraiser within seventy-five (75) days after the date
of the Purchase Option Notice, then Landlord shall select an appraiser and
Tenant shall select an appraiser by giving the other party written notice of
the name of the appraiser so selected within eighty (80) days after the date
of the Purchase Option Notice. The two (2) appraisers so selected shall,
within ninety (90) days after the date of the Purchase Option Notice, select
a third appraiser, which third appraiser shall determine the Fair Market
Value of the Property within thirty (30) days after the date of the selection
of such appraiser. The Fair Market Value of the Property as determined by
the appraisal shall be used to calculate the monthly Base Rent for the
applicable extension term in accordance with paragraph (a) above. In the
event either party fails to select an appraiser as provided herein, the
appraiser selected by the other party shall determine the Fair Market Value
of the Property. The cost of the appraisal shall be divided equally between
Landlord and Tenant. Any appraiser selected hereunder shall (i) not be a
partner, joint venturer or shareholder with Landlord or Tenant in any
partnership, joint venture, trust or corporation, other than a partnership,
trust or corporation whose shares or equity interests are publicly traded on
a national stock exchange; (ii) shall not be owned or controlled by Landlord
or Tenant; (iii) shall have been actively engaged for at least ten (10) years
immediately preceding his selection in commercial real estate appraisal
activities in the City of Austin, Texas; and (iv) shall be a member in good
standing of the American Institute of Real Estate Appraisers.



 Paragraph 2(c) contained the right of first refusal that Met Center invoked, which
states that the provisions of the market-price purchase option will "cease and terminate" when Met
Center delivers notice of a third party's bona fide offer to ERCOT:


(c) Landlord further grants to Tenant a right of first refusal to purchase the property
as follows[:]


 (i) Notwithstanding the provisions of (b) above [market-price purchase
option], in the event Landlord receives a bona fide offer from a third party
to purchase or acquire the Property that is acceptable to Landlord, Landlord
shall not sell and convey the Property without first offering the same to
Tenant upon the same price, terms and conditions as contained in the bona
fide offer. Landlord shall give Tenant written notice of receipt of such
bona fide acceptable offer, which notice shall contain the price, terms and
conditions of such offer, together with a copy of such offer. Upon delivery
of such notice to Tenant, Tenant's right to purchase the property pursuant
to paragraph (b) above shall cease and terminate.



(Emphasis added.)

 The next paragraph, 2(d), stated that "unless otherwise provided herein or under the
terms of an offer," closing for the sale and purchase of the property would occur within thirty days
after the date the option or right of first refusal was exercised. The closing did not occur.




The Fair Market Value Dispute


 The events preceding the suit to construe the lease occurred in 2003 and most are
documented in the parties' correspondence. ERCOT, through its president, Thomas Noel, exercised
its purchase option in writing on January 8 and, in accordance with the lease, requested Met Center's
determination of the property's fair market value within fifteen days, along with the reasonably
detailed assumptions and data supporting its determination.

 On January 21, Howard Yancy, Met Center's president, wrote to ERCOT
acknowledging its exercise of the purchase option and said that "the purpose of [its] letter [wa]s to
set forth Landlord's determination of the Fair Market Value of the Property in accordance with
Paragraph 2(b)(i) of Exhibit D to the Lease Agreement [the market-price purchase option]." (3) Met
Center then informed ERCOT that Daniel Macke of the Macke Company had been discussing the
"potential purchase of the property" with Met Center, but Macke had not made an offer before Met
Center received ERCOT's purchase option notice. Met Center also wrote that, after receiving the
notice, it communicated ERCOT's exercise of its option to Macke, and Macke submitted a "back-up" offer for the property in the event that Met Center and ERCOT did not consummate the sale. 
Met Center enclosed a copy of a letter from Macke, dated January 17, offering to purchase the
property for $6,885,000.


 The Macke letter stated its understanding that its offer was submitted "in a back-up
position and that ERCOT ha[d] an option to purchase." In addition to the price, the Macke letter
contained a general description of the property, deposit terms, and due diligence conditions. (4) It also
proposed a closing timeline, a method for calculation of closing costs, a list of ten types of
documents to be delivered to Macke "upon execution of the purchase agreement or earlier," and
specified that its offer was only valid until 5:00 p.m. on January 21. (5) Macke's letter concluded by
stating:

[t]his invitation is non-binding on either party. It must be understood that neither
party has any binding obligation to the other until such time as a formal purchase
agreement has been approved and executed by both parties and that neither this letter
nor any past nor future oral communications between representatives of either party
shall constitute a binding obligation.



Based on this letter, which Met Center called "the best evidence of fair market value" in its
possession, Met Center told ERCOT that its determination of the property's fair market value was
$6,885,000.

 Disagreeing with that determination, ERCOT wrote to Met Center on February 4 and
rejected the idea that "a conditional purchase offer [wa]s a true indicator of market value." Instead,
ERCOT proposed that the fair market value of the property was the 2002 Travis County Appraisal
District's assessed value of $4,231,483. ERCOT claimed it was entitled to a 40% credit from that
figure as the amount that its improvements contributed to the property's fair market value.

 Met Center responded by letter the next day, stating that it disagreed with ERCOT's 
proposed value of $2,538,890 ($4,231,483 less 40%), and reiterating that "there [wa]s no better
determination of the fair market value than what a willing buyer would pay a willing seller for that
property." Met Center said that if the property were purchased "in accordance with the terms and
conditions of the Third Party Offer, the purchase price reflected therein would in fact be the Fair
Market Value of the Property." With that in mind, Met Center suggested that Macke buy the
property and that the lease agreement be revised to permit ERCOT to purchase the property from
Macke if ERCOT paid at least the same price that Macke paid for it. Met Center observed that its
proposal was "exactly what would have occurred had Tenant not sent Landlord the purchase option
notice, except that Tenant would still retain the right to purchase the property for Fair Market
Value." If that plan was unacceptable to ERCOT, Met Center offered to reduce the purchase price
of the property by the amount of costs that it would incur under the Macke offer but not under the
lease, such as the brokerage commission and the title insurance fee. Met Center also stated that it
remained open to other ideas to determine the fair market value if ERCOT was still interested in
buying the property.

 ERCOT's letter to Met Center on February 13 voiced its dissatisfaction with Met
Center's proposal because its estimate of fair market value did not include any credit for the amount
that ERCOT spent on improvements. Regarding the Macke purchase, ERCOT questioned why
Macke would want to purchase the property for $6,885,000 only to sell it to ERCOT at a loss. 
ERCOT explained that if it retained its purchase option under the lease, it could still deduct the
contributed value of its improvements from the asserted fair market value of $6,885,000. ERCOT
complained that Macke's injection into the process unnecessarily complicated their effort to
determine fair market value and the amount by which the improvements contributed to that value.
It also noted that "[s]cenarios that might have occurred had ERCOT not exercised its purchase option
are immaterial, as ERCOT did exercise that option." To resolve the matter, ERCOT suggested that
they "split the difference" between their two offers for a value of $5,558,141.50. It conditioned this
agreement on receiving a 40% credit toward the fair market value for its improvements.

 The same day, Met Center rejected ERCOT's suggested value of $3,334,884.90
($5,558,141.50 less 40%) in writing. Met Center also asserted that the improvements ERCOT paid
for did not contribute to the fair market value of the property. Met Center suggested a meeting for
further discussion.

 Met Center sent another letter to ERCOT on February 19 to clarify that its first
response to ERCOT's notice--despite being written as an acknowledgment of ERCOT's exercised
purchase option and a proffer of fair market value under the purchase option--was intended to also
invoke the right of first refusal. (6) Conceding that it was "not clear" in that regard, Met Center stated
that this letter would serve as its notice to ERCOT of receipt of an acceptable, bona fide offer under
the lease. In accordance with the lease's right of first refusal, Met Center invited ERCOT to
purchase the property by matching Macke's offer. The same day, Met Center sent an e-mail to
ERCOT requesting a meeting "to work out the fair market value/purchase price of Building Three."

 Attorney Daniel Bitting wrote to Met Center on ERCOT's behalf on February 28 and
expressed doubt about the validity of Met Center's purported invocation of the right of first refusal
because ERCOT had previously exercised its purchase option. He also noted that he had not
received his requested assurances that Met Center "acknowledged and would comply with ERCOT's
contract to purchase the property under the purchase option." He further stated that ERCOT gave
notice of its intent to purchase the property if Met Center's attempted invocation of the right of first
refusal was finally determined to be valid and if ERCOT did not purchase the property under the
purchase option. He concluded by confirming the parties' meeting scheduled for March 3.

 Attorney Kathryn Allen wrote to ERCOT on Met Center's behalf on March 3,
forwarding Macke's revised offer dated February 24, which was "given in substitution" for the first
offer. The new Macke offer mirrored the former, including its specific designation as a non-binding
invitation, but it deleted the sentence that recognized ERCOT's purchase option and characterized
itself as a back-up offer. It also set a new acceptance deadline of 5:00 p.m. on March 3.

 ERCOT, Met Center, and their respective counsel met on March 3. When it appeared
that Noel, ERCOT's president, was detained, the parties began negotiating in his absence. They
tentatively agreed on a price range with a $5.85 million floor and a $6.4 million ceiling. After Noel
arrived at the meeting, he rejected the proposal. Both Met Center and ERCOT had appraisals of the
property at the time of this meeting but neither of the corporate presidents knew that any appraisal
existed. Noel was also unaware of an internal analysis that estimated the value of the property.

 On March 31, Met Center made a "protective designation" of its appraiser to comply
with the purchase option of the lease. Met Center specifically denied that the purchase option was
operative. ERCOT designated its appraiser the same day. On April 22, Met Center notified ERCOT
that Met Center had been "unable to confirm that the appraiser selected by ERCOT possesse[d] all
of the qualifications" required by the lease. Met Center requested that ERCOT supply information
or documentation supporting its appraiser's qualifications, but ERCOT did not respond.



The Lawsuit


 Met Center filed suit on March 5 for declaratory judgment and reformation of the
lease. ERCOT counterclaimed for declaratory judgment, breach of contract, specific performance,
fraudulent inducement, unjust enrichment, and quantum meruit. (7) The court's charge asked the jury
twenty-two questions, some with multiple subparts. During the charge conference, ERCOT did not
object to question number 12 concerning Met Center's receipt of a bona fide offer.

 At the conclusion of the trial, the jury found that ERCOT


 exercised its purchase option,

 was not in default under the lease at any time following the exercise of the
option,

 was ready, willing, and able to perform all its duties and obligations under the
option,

 failed to select an appraiser with the qualifications required by the lease and its
failure to do so was not excused,




 did not fail to attempt to agree in good faith to the fair market value of the
property prior to March 9, and




 was entitled to $275,400 of rent paid since the exercise of its option, plus
attorney's fees.




 The jury also found that Met Center




 did not commit fraud or statutory fraud by promising ERCOT a credit toward
the purchase price of the property upon the exercise of the purchase option,




 repudiated the purchase option by (i) denying that ERCOT was entitled to credit
for tenant improvements against the purchase price and (ii) denying that the
option was operative, and its repudiation was not the result of mutual mistake,
and

 received a bona fide offer acceptable to it for the purchase of the property.




The jury further found that the lease's use of 60 instead of 120 in the denominator of the fraction
used to calculate fair market value was the result of the parties' mutual mistake.

 ERCOT moved for judgment and requested that the court disregard the jury's answer
to the bona fide offer question. Met Center moved for judgment seeking a declaration that the right
of first refusal trumped the purchase option. Met Center also sought attorney's fees and reformation
of the lease to change the denominator of the fraction used to calculate fair market value.

 Based on the jury's affirmative response to the bona fide offer question, which
triggered the right of first refusal, the district court's judgment stated:


IT IS FURTHER ORDERED, ADJUDGED, and FINALLY DECREED that
declaratory relief be entered pursuant to paragraph 2(c) of EXHIBIT D to the Lease,
upon delivery of notice to Defendant The Electric Reliability Council of Texas, Inc.
of the offer presented by The Macke Company to purchase Building Three,
Defendant's right to purchase Building Three pursuant to paragraph 2(b) ceased and
terminated in all respects, notwithstanding its effort to exercise rights under
paragraph 2(b) by letter dated January 8, 2003.



The court ordered a take-nothing judgment on ERCOT's counterclaims against Met Center and
assessed costs against ERCOT. ERCOT filed a motion for new trial, and Met Center filed a motion
to modify the judgment requesting attorney's fees under the Uniform Declaratory Judgments Act. 
The court denied both motions. This appeal followed.



ANALYSIS


The Bona Fide Offer Question


 ERCOT argues that Met Center was not entitled to judgment because it did not
receive a bona fide offer as a matter of law and that the bona fide offer question improperly asked
the jury to decide a legal issue. See, e.g., Ergon, Inc. v. Dean, 649 S.W.2d 772, 776 (Tex.
App.--Austin 1983, no writ) (citing Mobil Chem. Co. v. Bell, 517 S.W.2d 245, 253 (Tex. 1974))
(court should not submit special issue to jury that requires it to determine question of law). But
when the court gave ERCOT the opportunity to comment at the charge conference, ERCOT did not
object to the submission of the bona fide offer question or its accompanying instruction:

THE COURT: All right. Counsels, we're in the formal charge
conference for Met Center vs. ERCOT case.


 . . . .


THE COURT: Okay. Let's go to No. 12. Any objection from the
plaintiff?


[Counsel for Met Center]: Your Honor, because the contract talks about bona fide
and not the word binding, we object to the portion of
the definition that talks about binding and would ask
that this be limited to an instruction that a bona fide
offer is one made in good faith.


[Counsel for ERCOT]: No objection.


THE COURT: Okay. Your objection, [counsel for Met Center], is
noted and overruled. I think I got this language from
one of the cases that was tendered to the court by the
plaintiff.



 In order to avoid submitting questions of law to the jury, the trial court must examine
the contract to determine what the contract requires of the parties. Rodgers v. RAB Invs., Ltd., 816
S.W.2d 543, 551 (Tex. App.--Dallas 1991, no writ). The court should submit to the jury any
disputed factual issues regarding failure of a party to conform to the contract. Id. (citing ITT
Commercial Fin. Corp. v. Riehn, 796 S.W.2d 248, 253 n.3 (Tex. App.--Dallas 1990, no writ)). 
When the jury determines conduct, it is not making a decision on the law. Id. at 551-52; see also
Various Opportunities, Inc. v. Sullivan Invs., Inc., 677 S.W.2d 115, 120 (Tex. App.--Dallas 1984,
no writ) (unnecessary for jury to determine legal effect of contract in order to determine factual
ability and intentions to perform thereunder).

 Question No. 12 asked the jury:


Did Met Center receive from the Macke Company a bona fide offer acceptable to
Met Center for the purchase of the property?


You are hereby instructed that a "bona fide offer" is one made in good faith capable
of being accepted so as to ripen into a valid and binding contract that could be
enforced by any party to it.


Answer "Yes" or "No."



Here, the incorporated instruction on bona fide offer required the jury to determine a fact question
on conduct--whether the offer was made in good faith--before it could find the existence of a bona
fide offer.

 The error of intermingling matters that were proper for the jury's determination with
matters only the court should have decided is an error that is waived by failure to object to the
charge. Ballesteros v. Jones, 985 S.W.2d 485, 499 (Tex. App.--San Antonio 1998, pet. denied); see
also Tex. R. Civ. P. 274. Parties must timely and plainly make the trial court aware of a complaint
about a jury charge and obtain a ruling to preserve error. First Valley Bank of Los Fresnos v. Martin,
144 S.W.3d 466, 474 (Tex. 2004) (Wainwright, J., concurring) (citing State Dep't of Highways &
Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex. 1992)). We conclude that Question No. 12
presented a mixed question of law and fact to the jury and that ERCOT waived this issue by failing
to object to the submission of the question during the charge conference. We overrule ERCOT's
first issue.


Factual Sufficiency of Bona Fide Offer Finding


 ERCOT also challenges the factual sufficiency of the evidence supporting the jury's
finding of a bona fide offer. When conducting a factual sufficiency review, we must consider all the
evidence, both in favor of and contrary to the verdict, and will set it aside only if it is so contrary to
the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. 
Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996). ERCOT specifically claims that there is not
enough evidence to support the jury's finding that Macke intended to be bound by his letter to Met
Center. Met Center argues that the record shows Macke made a good faith offer that was capable
of ripening into a contract and that the offer was acceptable to Met Center.

 Because ERCOT did not object to the jury charge, we review the sufficiency of the
evidence on the bona fide offer question in light of the charge submitted. See Bradford v. Vento, 48
S.W.3d 749, 754 (Tex. 2001). It is the court's charge, not some other unidentified law, that
measures the sufficiency of the evidence when the opposing party fails to object to the charge. 
Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000). In the absence of a proper objection, the court's
charge is controlling, even if the charge is not entirely correct. Wal-Mart Stores, Inc. v. Sturges, 52
S.W.3d 711, 715 (Tex. 2001) (sufficiency of evidence must be assessed "in light of the jury charge
the district court gave without objection"); City of Fort Worth v. Zimlich, 29 S.W.3d 62, 71 (Tex.
2000).

 When ERCOT's counsel asked Macke about his definition of a "letter of intent,"
Macke testified that it was a letter explaining interest in pursuing the purchase of the property and
that it was a nonbinding legal document. ERCOT's counsel further inquired:


Q. Right, but does this--does this--did you intend by sending
this letter itself to be bound to a contract to purchase the
property?


THE WITNESS: That was--that's the intent.


[ERCOT's counsel]: Then what do you mean by saying that it's a nonbinding
legal document?


A. Well, what I mean by that is that it's just a letter of intent. 
I don't have a lot of the due diligence information in order
to truly evaluate whether or not that property makes sense
on behalf of a client and so in order to determine whether
or not that--something like that would really work, I
would have to receive a lot more additional information;
however, it's the basis of an understanding that would lead
to a purchase agreement, which would be a binding
agreement.


 . . . .


Q. Your offers of January 17 and February 24, you've already
told us, were done with the authorization of Cherry Creek
[Macke's client]. Is that correct?


A. Yes.


Q. And they were serious offers?


A. Yes.


Q. And they were made in good faith?


A. Yes.


Q. And at the time your intention was to purchase the
buildings--or the building?


A. Assuming that everything during our due diligence panned
out, yes.


 . . . .


Q. Did Mr. Yancy ever inform you in writing that he found
this letter of intent acceptable?


A. No.


Q. Did he ever tell you that orally?


A. Not that I recall.



 Yancy's testimony in response to questioning by ERCOT's counsel echoed Macke's
understanding of the letter of intent as nonbinding and characterized the use of such letters as typical:


Q. Was the Macke proposal, in fact, acceptable to Met Center?


A. Yes.


 . . . .


Q. All right. So you sent this [letter] to Reliability Council and you said, "There's
somebody who's actually out there willing to buy the property at this price of
$6,885,000. They're willing to be bound to that price." That's why you sent it
to us, isn't it?


A. Yes, that's--this is typical in real estate transactions of this size. Typically, a
third-part[y] buyer will send a letter of intent so the parties will agree to the
substantive terms of the agreement to be followed immediately by--terms into
a contract.


 . . . .


Q. Would it surprise you to learn that Mr. Macke testified . . . that he did not
consider this to be a binding offer at all?


A. No, because that's not how transactions of this nature are handled, in large
commercial real estate transactions. What was done was normal and customary,
which is, one side presents a letter of intent to the other side which sets forth all
the substantive terms or to reach agreement on that, to follow from that a
purchase agreement is executed and the transaction is consummated. That's
why this language doesn't say if we receive a bona fide contract. It's if we
receive a bona fide offer.



 Through Noel's testimony, ERCOT asserted that Macke's letter was intended to be
nonbinding:


Q. What was it about this Macke Company letter that caused you to give it little
credence?


A. Well, . . . it says, "We understand that we are submitting this offer in a back-up
position." There were many caveats . . . with respect to all the things he wanted
to do before, in my view, he offered nothing binding. And the fact that it
expired four days after it was presented to us suggested to me that it was--it was
described as a letter of intent. And I've seen letters of intent used many, many
ways in my experience. They're also called letters of interest. They're not
binding. They don't have any impact. That's the way, in my experience,
they've always been handled. So I just saw this as, frankly, a fairly transparent
attempt to establish a number that frankly was higher than any number I had
ever heard expressed.



 Review of the record shows that, although Macke testified that his letter of intent was
nonbinding, there was testimony that his letter was a serious offer made in good faith and that he
intended to purchase the building as long as the due diligence investigation "panned out." Macke
and Yancy testified that due diligence conditions are typically included in real estate purchase
agreements. Jurors are the sole judges of the witnesses' credibility and the weight to be given their
testimony. City of Keller v. Wilson, 2005 Tex. LEXIS 436, at *39 (Tex. June 10, 2005). Reviewing
courts cannot impose their own opinions to the contrary. Id.

 In this case, after considering all the evidence, we cannot say that the jury's answer
to Question No. 12 is so contrary to the overwhelming weight and preponderance of the evidence
as to be clearly wrong and manifestly unjust. Accordingly, we conclude that the evidence was
factually sufficient to support the finding of a bona fide offer that was acceptable to Met Center, and
we overrule ERCOT's second issue.



The Lease's Right of First Refusal Versus the Exercised Purchase Option


 ERCOT next asserts that the right of first refusal should not take precedence over the
exercised purchase option. See Sinclair Refining Co. v. Allbritton, 218 S.W.2d 185, 188-89 (Tex.
1949). A right of first refusal, also known as a preemptive or preferential right, empowers its holder
with a preferential right to purchase the subject property on the same terms offered by or to a bona
fide purchaser. Tenneco, Inc. v. Enterprise Prods. Co., 925 S.W.2d 640, 644 (Tex. 1996). Such a
right is distinct from a purchase option, which gives the holder the right to purchase at its election
within an agreed period at a named price. Allbritton, 218 S.W.2d at 188. If the price is to be the
market value of the premises at the time the option is exercised, then no price is specified. Id.

 Because neither party in this case claimed that the lease was ambiguous, we may
construe it as a matter of law. MCI Telecomms. Corp. v. Texas Utils. Elec. Co., 995 S.W.2d 647,
650-51 (Tex. 1999). We review the district court's legal conclusions de novo. Id. at 651. In
construing a lease, we ascertain and give effect to the parties' intentions as expressed in the
document. Frost Nat'l Bank v. L&F Distribs., Ltd., 165 S.W.3d 310, 311-12 (Tex. 2005). We
consider the entire writing and attempt to harmonize and give effect to all its provisions by analyzing
them with reference to the whole agreement. Id. at 312. Our construction is "from a utilitarian
standpoint bearing in mind the particular business activity sought to be served" and "will avoid when
possible and proper a construction which is unreasonable, inequitable, and oppressive." Id. (citing
Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 530 (Tex. 1987)).

 By its terms, the lease between Met Center and ERCOT prioritized the right of first
refusal over the purchase option. Paragraph 2(c)(i) states that the right of first refusal may apply
notwithstanding the purchase option provisions and that the purchase option will terminate when
Met Center delivers notice of a third party's bona fide offer to ERCOT ("Upon delivery of such
notice to Tenant, Tenant's right to purchase the property pursuant to paragraph (b) above shall cease
and terminate."). Significantly, the right of first refusal does not merely state that a dormant right
to exercise the purchase option shall cease and terminate with the delivery of the bona fide offer
notice; it states that upon delivery of such notice the Tenant's "right to purchase" the property
pursuant to the purchase option shall cease and terminate.

 In contrast to the right of first refusal, the market-price purchase option in section 2(b)
lacks any language prioritizing it over another lease provision. Additionally, none of the leases in
the authority that ERCOT cites involved a market-price option with a right of first refusal that would
cause the option to "cease and terminate" upon notice of a third party's bona fide offer, as in Met
Center's lease with ERCOT. See, e.g., Allbritton, 218 S.W.2d at 186-87; Pitman v. Sanditen, 626
S.W.2d 496, 496-97 (Tex. 1981); Tye v. Apperson, 689 S.W.2d 320, 321 (Tex. App.--Fort Worth
1985, writ ref'd n.r.e.); see also Wanda Ellen Wakefield, Annotation, Construction and Effect of
Options to Purchase at Specified Price and at Price Offered by Third Person, Included in Same
Instrument, 22 A.L.R.4th 1293 (2004).

 There was evidence that the parties were represented by counsel in their lease
negotiations. We determine the intent of the parties from what they actually expressed in the lease
as written, not what they may have intended but failed to express. Heritage Res. v. Nationsbank, 939
S.W.2d 118, 130 (Tex. 1996). As a rule, parties have the right to contract as they see fit as long as
their agreement does not violate the law or public policy. In re Prudential Ins. Co. of Am., 148
S.W.3d 124, 129 & n.11 (Tex. 2004).

 Given the terms of the right of first refusal in the lease and the jury's affirmative
finding on the bona fide offer question, the district court did not err in declaring that ERCOT's right
to buy Building Three under the purchase option ceased, notwithstanding its effort to exercise its
rights under paragraph 2(b), when Met Center delivered notice of Macke's offer to ERCOT. We
overrule ERCOT's third issue.


Jury's Finding that Met Center Repudiated the Purchase Option is Immaterial


 In its final issue, ERCOT argues that Met Center could not invoke the right of first
refusal because the jury found that Met Center repudiated the purchase option by (i) denying that
ERCOT was entitled to any credit against the purchase price of the property based on tenant
improvements and (ii) denying that the purchase option was operative.

 Repudiation consists of words or actions by a contracting party indicating that the
party is not going to perform in the future. SAVA Gumarska in Kemijska Industria D.D. v. Advanced
Polymer Scis., Inc., 128 S.W.3d 304, 315 (Tex. App.--Dallas 2004, no pet.). It is conduct that
shows a fixed intention to abandon, renounce, and refuse to perform the contract. Id. ERCOT
argues that Met Center's repudiation of the purchase option amounted to a breach of the entire lease
and that Met Center was no longer in a position to invoke the right of first refusal and compel
ERCOT's compliance with that provision. See Murray v. Crest Constr., Inc., 900 S.W.2d 342, 344
(Tex. 1995). Met Center counters that the jury's findings that Met Center repudiated the lease are
rendered immaterial by the district court's ruling as a matter of law that the right of first refusal
trumped the purchase option.

 A question is immaterial when it should not have been submitted; when it calls for
a finding beyond the province of the jury, such as a question of law; or when it was properly
submitted but has been rendered immaterial by other findings. Southeastern Pipe Line Co. v.
Tichacek, 997 S.W.2d 166, 172 (Tex. 1999). A trial court may disregard the jury's finding on
immaterial issues and render judgment based upon the remaining findings. Great Am. Prods. v.
Permabond Int'l, 94 S.W.3d 675, 682 (Tex. App.--Austin 2002, pet. denied); see also C&R
Transport, Inc. v. Campbell, 406 S.W.2d 191, 194 (Tex. 1966). Here, the court considered the jury's
finding of a bona fide offer and correctly determined that Met Center's notice to ERCOT of Macke's
bona fide offer to purchase Building Three trumped ERCOT's exercised purchase option based on
the terms of the right of first refusal in their building's lease. Thus, the jury's findings that Met
Center repudiated the lease were rendered immaterial by the district court's declaration that the right
of first refusal trumped the purchase option. We overrule ERCOT's fourth point of error.


CONCLUSION


 We have concluded that (i) ERCOT waived any issue on the bona fide offer question,
a mixed question of law and fact, by failing to object to the submission of the question during the
charge conference, (ii) the evidence was factually sufficient to support the finding of a bona fide
offer, (iii) the language of the parties' lease expressed their intent that the right of first refusal trump
the purchase option, and (iv) the jury's findings of Met Center's repudiation were rendered
immaterial by the court's declaration that the right of first refusal trumped the purchase option.
Because the court did not err in declaring that Met Center's notice to ERCOT of Macke's bona fide
offer to purchase Building Three trumped ERCOT's exercised purchase option based on the terms
of the right of first refusal in their building's lease, we affirm the judgment of the district court.



 

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: September 22, 2005
1. The jury found that the use of the number 60 as the denominator instead of 120--the total
number of months in the lease's initial term--resulted from the parties' mutual mistake. The
judgment reformed the lease, changing the fraction's denominator to 120 months. Thus, the
reformed calculation was FMV - improvements' contribution to FMV - $900,000 x lease's
remaining months/120 = price.
2. The mention of a "renewal notice" is inapplicable because the lease was in its initial 120-month term. Met Center's counsel recalled ERCOT's former counsel testifying that the "renewal
notice" phrase was an error. That remark did not draw an objection at trial and the phrase does not
appear elsewhere in this purchase option or in the right of first refusal. Our review of the record
suggests that the phrase may have been mistakenly copied from the "Renewal Options" section of
the lease, immediately preceding the purchase options and the right of first refusal section.
3. All of the correspondence referenced is between Howard Yancy, president of Zydeco
Development, Inc., Met Center's sole general partner, and Thomas Noel, president of ERCOT,
unless otherwise noted.
4. Macke required thirty days from the date of an executed purchase agreement for reviewing
documents, obtaining inspections, and "do[ing] that which, in the opinion of Buyer, [wa]s
ncecessary." If unsatisfied with the results of such inspections and investigations, Macke reserved
the right to terminate the purchase agreement without obligation or liability to Met Center.
5. This was also the date of Met Center's response to ERCOT's purchase option notice. Met
Center's subsequent reliance on Macke's offer shows that it did not expire on January 21.
6. Met Center's January 21 letter stated that its purpose was to set forth Met Center's
determination of the property's fair market value in accordance with the purchase option. It also
informed ERCOT that Macke had not made an offer on the property before Met Center received
ERCOT's purchase option notice. The letter did not mention the right of first refusal.
7. ERCOT nonsuited its claims for unjust enrichment and quantum meruit during trial.